ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                         :
UNITED STATES OF AMERICA,
                                         :
        - v. -                                INDICTMENT
                                         :
JAMES GANSMAN and                             08 Cr.
DONNA MURDOCH,                           :

                Defendants.  **08 CRIM.    471**
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DATE FILED: 7/27/08

                        COUNT ONE

        (Conspiracy To Commit Securities Fraud)

        The Grand Jury charges:

                Relevant Entities and Individuals

        1.    At all relevant times, Ernst and Young, LLP

("E & Y") operated as a professional services partnership,

providing assurance, tax, transaction and advisory services

worldwide.  As part of its business as a full-service

professional services partnership, at all times relevant to this

Indictment, E & Y advised entities engaging in mergers and

acquisitions transactions and considering engaging in such

transactions.

        2.    At all relevant times, JAMES GANSMAN, the

defendant, resided in New York, New York, and was a partner in

E & Y and in the "Transactional Advisory Services" department in

the New York, New York office of E & Y.  At all relevant times,

GANSMAN provided transactional advisory services, including human

resources consulting services, to E & Y clients.  At all relevant

times, GANSMAN was an attorney licensed to practice law in New York.

3.    At all relevant times, DONNA MURDOCH, the defendant, resided in Malvern, Pennsylvania, and was employed as a consultant to, and an Investment Banking Managing Director at, a broker-dealer and investment and financial services company in Oaks, Pennsylvania registered with the National Association of Securities Dealers ("NASD") that provided consulting, investment banking, and investment advising services ("Murdoch's Firm"). Murdoch's Firm's website stated that MURDOCH "received a B.S. from The Wharton School of the University of Pennsylvania."  In or about April 2006, MURDOCH passed the Series 7 examination and became a registered securities trader with the NASD.  In or about May 2006, MURDOCH passed the Series 63 examination and became a registered securities agent with the NASD.

<u>E & Y's Confidentiality Policy</u>

4.    At all relevant times, E & Y maintained written policies prohibiting the premature dissemination of material non-public and confidential information relating to pending transactions in which E & Y was involved.  At or about the time JAMES GANSMAN, the defendant, applied for employment at E & Y in or about July 1991, GANSMAN executed a written acknowledgment that, "[i]f employed by Ernst & Young, [he] underst[oo]d that . . . [he] would be prohibited from disclosing nonpublic information regarding clients or other entities to anyone other than for

2

authorized firm business, or using it for any personal purpose."
Annually beginning at least as early as 2003, GANSMAN was
provided with a copy of E & Y's "Policies Regarding Trading of
Securities While in Possession of Confidential or Non-Public
Information ("Insider Trading")."  Annually beginning at least as
early as 2002, including on or about April 8, 2003, April 19,
2004, May 13, 2005, May 15, 2006, and April 30, 2007, GANSMAN
certified that he had read, understood, and was in compliance
with the policy. This policy stated, among other things, the
following:

> Federal securities laws prohibit the use of
> certain material non-public information for
> personal gain.

> \* \* \*

> Information about the following matters has
> been found by courts to be material in
> certain situations: . . . acquisitions,
> including mergers and tender offers.

> \* \* \*

> In some situations, the mere fact that we
> have been engaged by a company may be
> considered to be material information.
> Examples are certain special investigation or
> due-diligence engagements.

> \* \* \*

> [A] person who has non-public information can
> violate the securities laws even if he or she
> does not trade securities but instead "tips"
> a family member or friend with the
> information, and that person trades for his
> or her own account.

* * *

> It is the firm's longstanding policy that
> partners . . . may not purchase or sell
> securities while in possession of material,
> non-public information, and may not disclose
> such information to anyone except on a strict
> "need-to-know" basis.  Violations of this
> policy can result in immediate dismissal from
> the firm.

### Murdoch's Firm's Confidentiality Policy

5.    On or about December 15, 2006, MURDOCH completed a "2006 Annual Compliance Questionnaire" in which she stated that she understood that she could "not use or disseminate to others any material insider information relating to securities."

6.    At all relevant times, Murdoch's Firm maintained written policies prohibiting the premature dissemination of material non-public and confidential information relating to pending transactions in which Murdoch's Firm was involved.  On or about March 6, 2007, MURDOCH acknowledged receiving Murdoch's Firm's "Policies and Procedures" manual, which included the "Firm Policy On Insider Trading."  MURDOCH certified regarding the manual that she was "responsible for knowing its contents" and that she had "read and understood its contents to the level of being able to answer questions about it from supervisors and regulatory auditors and to put its principles in practice."  The manual stated, among other things, the following:

> SEC Rule 10b-5 under the Securities Exchange
> Act of 1934 generally makes it unlawful for
> any person to use . . . material inside

4

information that has not been publicly
disseminated in connection with the purchase
or sale of securities.

* * *

It is the policy of [Murdoch's Firm] that no
personnel . . . may trade . . . any security
of any issuer about which the individual
possesses material non-public information at
or prior to the time such information is
publicly disclosed and available in the
marketplace.

* * *

Further, no personnel may communicate any
material non-public information to anyone
outside the Company . . . .

* * *

Material information is defined as a)
information which in reasonable and objective
contemplation might affect the value of the
issuer's publicly traded securities, or b)
information which, if known, would clearly
affect investment judgment, or which directly
bears on the intrinsic value of the issuer's
publicly traded securities.  In determining
whether the information obtained comes within
the above definition, and is therefore
unusable, the following terms apply:

"Material information" is any information
that a reasonable investor might consider
important in making an investment decision.
Examples of "material information" would be:

- Mergers, acquisitions, tender
  offers or restructuring; . . .

- The appointment of an investment
  banker or signing a letter of
  intent with an underwriter . . . .

* * *

5

"Publicly disseminated" means information
that is generally available to the public and
about which the public has had a reasonable
opportunity to make an investment decision.

* * *

The most common violations of the "insider
trading" rules include purchasing or selling
securities on the basis of such information .
. . and "tipping" such information to anyone
or using it as a basis for recommending the
purchase or sale of a security (this includes
spreading rumors).

Persons who are in possession of material
inside information that has not been
disseminated to the public are prohibited
from:

- Purchasing or selling securities
  for their own accounts . . .;

- Disclosing such information or
  any conclusions based thereon
  to anyone.

If, after considering these items, any of the
Company's Registered Representatives . . .
believes that the information he or she has
is material and non-public, he or she should
take the following steps: . . .

- Do not purchase or sell the
  securities until all concerns have
  been addressed; and,

- Do not communicate the
  information to others until
  there is no danger of insider
  trading.

<u>The Insider Trading Scheme</u>

7.    At various times relevant to this Indictment,

E & Y provided transaction advisory services to the E & Y clients

6

listed below, in connection with business combination transactions ("the E & Y Transactions"). While employed at E & Y, JAMES GANSMAN, the defendant, had access to material, non-public information concerning the E & Y Transactions listed below:

| E & Y CLIENT | COUNTERPARTY | TRANSACTION | DATE OF PUBLIC ANNOUNCEMENT |
|---|---|---|---|
| Advanced Micro Devices, Inc. ("AMD") | ATI Technologies | AMD subsidiary Alberta ULC to acquire ATI | 7/24/2006 |
| Blackstone Group | Freescale Semiconductor | Consortium led by Blackstone to acquire Freescale | 9/11/2006 |
| NVIDIA | Portal Player | NVIDIA to acquire Portal | 11/6/2006 |
| Polycom | Spectralink | Polycom to acquire Spectralink | 2/7/2007 |
| Jarden Corp | K2, Inc. | Jarden to acquire K2 | 4/25/2007 |
| Siemens | Dade Behring | Siemens to acquire Dade Behring | 7/25/2007 |
| Vivendi S.A. | Activision, Inc. | Vivendi to acquire Activision | 12/2/2007 |

        8.    From in or about May 2006 up to and including in or about December 2007, JAMES GANSMAN and DONNA MURDOCH, the defendants, participated in a scheme to defraud by executing securities transactions based on material, nonpublic information

regarding the E & Y Transactions listed in paragraph 7 above (the "E & Y Inside Information"). At all relevant times, GANSMAN and MURDOCH maintained a relationship of a personal nature.

9. JAMES GANSMAN, the defendant, was the E & Y partner in charge of the human resource consulting services provided by E & Y with respect to all of the E & Y Transactions listed in paragraph 7 above and, due to that position, obtained E & Y Inside Information. GANSMAN regularly and repeatedly communicated with DONNA MURDOCH, the defendant, and provided DONNA MURDOCH, the defendant, with E & Y Inside Information in violation of (a) the fiduciary and other duties of trust and confidence owed by GANSMAN to E & Y and its clients; (b) the expectations of confidentiality of the E & Y clients; and (c) E & Y's written policies regarding the use and safekeeping of confidential and material, non-public information.

10. To carry out the scheme, JAMES GANSMAN, the defendant, typically communicated with DONNA MURDOCH, the defendant, at some point after he had been assigned to work on an E & Y Transaction but before the subject of that particular E & Y Transaction had been publicly and officially announced. During these communications, in breach of the fiduciary and other duties of trust and confidence owed by GANSMAN to E & Y and its clients, the expectations of confidentiality of the E & Y clients, and E & Y's written policies regarding the use and safekeeping of

8

confidential and material, non-public information, GANSMAN

provided E & Y Inside Information to MURDOCH regarding the E & Y

Transaction in question.  After receiving the E & Y Information,

MURDOCH purchased securities of the target company involved in

the particular E & Y Transaction based on E & Y Inside

Information.  MURDOCH used at least two brokerage accounts under

her control to execute these transactions, which generated over

$390,000 in profit for her.

        11.  For example, on or about June 23, 2006, GANSMAN

learned that E & Y had been retained by the Blackstone Group

("Blackstone"), a private equity firm, in connection with a

possible acquisition by an investment consortium led by

Blackstone of Freescale Semiconductor Corporation ("Freescale"),

and that Blackstone wanted the transaction to be "treated

superconfidential," and was told in an internal E & Y email

message, "[d]o not breathe the name of the target outside of

team."  Between on or about June 23, 2006, and July 18, 2006,

GANSMAN and MURDOCH were in frequent contact.  For example,

during that period, they communicated over 400 times via

telephone and text message. In breach of the fiduciary and other

duties of trust and confidence owed by GANSMAN to E & Y and its

clients, the expectations of confidentiality of the E & Y

clients, and E & Y's written policies regarding the use and

safekeeping of confidential and material, non-public information,

9

GANSMAN provided E & Y Inside Information to MURDOCH regarding the transaction in question.  Between on or about July 18, 2006, and on or about September 8, 2006, MURDOCH bought options to purchase Freescale stock using one of MURDOCH's brokerage accounts.  On or about September 11, 2006, a wire service reported that Freescale would be acquired by an investment consortium led by Blackstone, and Freescale publicly announced it was involved in business discussions.  On or about September 11, 2006, MURDOCH sold approximately 410 Freescale options.  On or about September 12, 2006, MURDOCH sold approximately 280 Freescale options.  MURDOCH profited more than approximately $158,000 from her trades in Freescale options.  On or about September 15, 2006, Freescale publicly announced that Blackstone and other entities would acquire Freescale.

12.  Similarly, by at least on or about April 17, 2007, GANSMAN learned that E & Y was performing human resources consulting services for the Jarden Corporation ("Jarden") in connection with a possible acquisition by Jarden of K2, Inc. ("K2").  Between on or about April 17, 2007, and April 24, 2007, GANSMAN and MURDOCH were in frequent contact.  For example, during that period, they communicated over 120 times via telephone and text message.  In breach of the fiduciary and other duties of trust and confidence owed by GANSMAN to E & Y and its clients, the expectations of confidentiality of the E & Y

clients, and E & Y's written policies regarding the use and safekeeping of confidential and material, non-public information, GANSMAN provided E & Y Inside Information to MURDOCH regarding the transaction in question. On or about April 24, 2007, MURDOCH bought approximately 150 options to purchase K2 stock using one of MURDOCH's brokerage accounts. On or about April 24, 2007, Jarden entered into a definitive plan of merger with K2. On or about April 25, 2007, Jarden publicly announced that it had acquired K2 pursuant to an agreement signed on April 24, 2007. On April 25, 2007, MURDOCH sold approximately 150 K2 options using one of MURDOCH's brokerage accounts. MURDOCH profited more than approximately $27,000 from her trades in K2 options.

13. Similarly, by at least on or about July 9, 2007, GANSMAN learned that E & Y was performing human resources consulting services for Siemens, a multinational conglomerate, in connection with the possible acquisition by Siemens of Dade Behring, Inc ("Dade"). Between on or about July 9, 2007, and July 12, 2007, GANSMAN and MURDOCH were in frequent contact. For example, during that period, they communicated over 15 times via telephone and text message. In violation of the fiduciary and other duties of trust and confidence owed by GANSMAN to E & Y and its clients, the expectations of confidentiality of the E & Y clients, and E & Y's written policies regarding the use and safekeeping of confidential and material, non-public information,

GANSMAN provided E & Y Inside Information to MURDOCH regarding the transaction in question. On or about July 12, 2007, MURDOCH bought approximately 100 options to purchase Dade stock using one of MURDOCH's brokerage accounts. On or about July 25, 2007, Siemens publicly announced it had made a tender offer to acquire Dade. On or about July 25, 2007, MURDOCH sold approximately 100 Dade options using one of MURDOCH's brokerage accounts. MURDOCH profited more than approximately $138,000 from her trades in Dade options.

14. Similarly, by at least on or about August 1, 2007, GANSMAN learned that E & Y was performing human resources consulting services for Vivendi Corporation in connection with the possible acquisition by Vivendi of Activision Corporation. Between on or about August 1, 2007, and August 24, 2007, GANSMAN and MURDOCH were in frequent contact. For example, during that period, they communicated over 140 times via telephone and text message. In breach of the fiduciary and other duties of trust and confidence owed by GANSMAN to E & Y and its clients, the expectations of confidentiality of the E & Y clients, and E & Y's written policies regarding the use and safekeeping of confidential and material, non-public information, GANSMAN provided E & Y Inside Information to MURDOCH regarding the transaction in question. Between on or about November 28, 2007, and on or about November 30, 2007, MURDOCH bought approximately

143 options to purchase Activision stock using one of MURDOCH's brokerage accounts.  On or about December 2, 2007, Vivendi publicly announced it was acquiring Activision.  On or about December 3, 2007, MURDOCH sold approximately 143 Activision options.  MURDOCH profited more than approximately $19,000 from her trades in Activision options.

## The Conspiracy

15.  From in or about May 2006 up to and including in or about December 2007, in the Southern District of New York and elsewhere, JAMES GANSMAN and DONNA MURDOCH, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Object of the Conspiracy

### Securities Fraud

16.  It was a part and object of the conspiracy that JAMES GANSMAN and DONNA MURDOCH, the defendants, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in

connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by:   (a) employing devices, schemes and artifices to defraud;  (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

<u>Means and Methods of the Conspiracy</u>

17.   Among the means and methods by which JAMES GANSMAN and DONNA MURDOCH, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.   GANSMAN, in his role as a partner at E & Y in the Transactional Advisory Services department, misappropriated E & Y Inside Information in violation of (a) the fiduciary and other duties of trust and confidence that GANSMAN owed to E & Y and E & Y clients;  (b) the expectations of confidentiality of the E & Y clients; and (c) E & Y's written policies regarding the use and safekeeping of confidential and material, non-public information.

14

b.    GANSMAN, in breach of his fiduciary and other duties of trust and confidence to E & Y and its clients, disclosed E & Y Inside Information that he had misappropriated from E & Y and the E & Y clients to MURDOCH, with the understanding that MURDOCH would use E & Y Inside Information to purchase and sell securities, and thereby generate illegal profits.

c.    MURDOCH, while in possession of E & Y Inside Information that she knew had been misappropriated by GANSMAN in breach of GANSMAN's duty to keep such information confidential, purchased and sold securities based on such information and thereby received illegal profits.

<u>Overt Acts</u>

18.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    Between on or about June 23, 2006, and July 18, 2006, GANSMAN provided E & Y Inside Information to MURDOCH regarding a possible transaction involving Freescale.

b.    Between on or about July 18, 2006, and on or about September 8, 2006, MURDOCH bought Freescale options using one of MURDOCH's brokerage accounts.

15

c.    On or about September 11, 2006, after a wire service had reported that Freescale would be acquired by an investment consortium including Blackstone and Freescale had publicly announced it was involved in business discussions, and on or about September 12, 2006, MURDOCH sold Freescale options using one of MURDOCH'S brokerage accounts.

d.    Between on or about April 17, 2007, and April 24, 2007, GANSMAN provided E & Y Inside Information to MURDOCH regarding a possible transaction involving K2.

e.    On or about April 24, 2007, MURDOCH bought K2 options using one of MURDOCH's brokerage accounts.

f.    On or about April 25, 2007, after Jarden entered into a definitive plan of merger with K2 and publicly announced that it had acquired K2, MURDOCH sold approximately 150 K2 options using one of MURDOCH's brokerage accounts.

g.    Between on or about July 9, 2007, and July 12, 2007, GANSMAN provided E & Y Inside Information to MURDOCH regarding a possible transaction involving Dade.

h.    On or about July 12, 2007, MURDOCH bought approximately 100 Dade options using one of MURDOCH's brokerage accounts.

i.    On or about July 25, 2007, after Siemens publicly announced it had made a tender offer to acquire Dade, MURDOCH sold approximately 100 Dade options using one of

MURDOCH's brokerage accounts.

j.    Between on or about August 1, 2007, and August 24, 2007, GANSMAN provided E & Y Inside Information to MURDOCH regarding a possible transaction involving Activision.

k.    Between on or about November 28, 2007, and November 30, 2007, MURDOCH bought approximately 143 Activision options using one of MURDOCH's brokerage accounts.

l.    On about about December 12, 2007, after Vivendi and Activision publicly announced that Vivendi would acquire Activision, MURDOCH sold approximately 143 Activision options.

(Title 18, United States Code, Section 371.)

COUNTS TWO THROUGH TWELVE

(Securities Fraud)

The Grand Jury further charges:

19.    The allegations contained in paragraphs 1-14, and 17-13, of this Indictment are repeated and realleged as if fully set forth herein.

20.    On or about the dates set forth below, in the Southern District of New York and elsewhere, JAMES GANSMAN and DONNA MURDOCH, the defendants, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with

the purchase and sale of securities, did use and employ
manipulative and deceptive devices and contrivances, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by
(a) employing devices, schemes and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
the light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices and courses of
business which operated and would operate as a fraud and deceit
upon persons, to wit, GANSMAN provided material, nonpublic
information to MURDOCH, in breach of the fiduciary and other
duties of trust and confidence owed by GANSMAN to E & Y and its
clients, the expectations of confidentiality of the E & Y
clients, and E & Y's written policies regarding the use and
safekeeping of confidential and material, non-public information,
and MURDOCH executed the securities transactions listed below
based on the material, non-public information she obtained from
GANSMAN:

| COUNT | DATE | SECURITY | TRANSACTION |
|-------|------|----------|-------------|
| TWO | July 19, 2006 | ATI | purchased 63 options |
| THREE | August 30, 2006 | Freescale | purchased 172 options |
| FOUR | September 1, 2006 | Freescale | purchased 195 options |
| FIVE | September 7, 2006 | Freescale | purchased 243 options |
| SIX | October 30, 2006 | Portal Player | purchased 500 options |

| SEVEN | October 31, 2006 | Portal Player | purchased 28 options |
| EIGHT | February 2, 2007 | Spectralink | purchased 130 options |
| NINE | April 24, 2007 | K2 | purchased 150 options |
| TEN | July 12, 2007 | Dade Behring | purchased 100 options |
| ELEVEN | November 28, 2007 | Activision | purchased 110 options |
| TWELVE | November 30, 2007 | Activision | purchased 33 options |

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2, and Title 18, United States Code, Section 2).

<u>FORFEITURE ALLEGATION FOR COUNTS ONE THROUGH TWELVE</u>

21. As the result of committing one or more of the

offenses alleged in Counts One through Twelve (<u>i.e.</u>, conspiracy

to commit securities fraud, in violation of Title 18, United

States Code, Sections 371; and securities fraud, in violation of

Title 15, United States Code, Sections 78j(b) & 78ff; Title 17,

Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2;

and Title 18, United States Code, Section 2), defendants JAMES

GANSMAN and DONNA MURDOCH shall forfeit to the United States

pursuant to Title 18, United States Code, Section 981(a)(1)(C)

and Title 28, United States Code, Section 2461, all property,

real and personal, that constitutes or is derived from proceeds

traceable to the commission of the offense.

19

<u>Substitute Asset Provision</u>

22.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;


(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981, Title 28, United States Code, Section 2461 and Title 18, United States Code, Sections 371, and 2, Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, Title 21, United States Code, Section 853(p)).

_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JAMES GANSMAN and
DONNA MURDOCH,

Defendants.

## INDICTMENT

08 Cr.

(18 USC 371; 15 USC 78j(b) & 78ff; 17 CFR
240.10b-5 & 240.10b5-2; 18 USC 2.)

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

Foreperson.